AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of a 2019 Volvo Truck | ) | |
| bearing California (CA) license plate "YP82479" | ) | Case No. 2:24-MJ-3692 |
| with VIN 4V4NC9EHXKN219669 | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-5*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 549 | Removing Goods from Customs Custody |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 545 | Smuggling |
| 18 U.S.C. § 542 | Entry of Goods By Means of False Statement |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_/s/_____
*Applicant's signature*

Martina Doino, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Los Angeles, CA_____

_____
*Judge's signature*

The Hon. Rozella A. Oliver, Magistrate Judge
*Printed name and title*

AUSA: Colin Scott (x3159)

## ATTACHMENT A-5

**PREMISES TO BE SEARCHED**

A 2019 Volvo Truck bearing California (CA) license plate "YP82479" with VIN 4V4NC9EHXKN219669 registered to American Sunshine World Inc. at **SUBJECT PREMISES 1** (the "**SUBJECT VEHICLE 2**").

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband fruits, or instrumentalities of violations of 18 U.S.C. § 549 (Removing Goods from Customs Custody); 18 U.S.C. 371 (Conspiracy); 18 U.S.C. § 545 (Smuggling Goods into the United States); and 18 U.S.C. § 542 (Entry of Goods by Means of False Statements) (collectively, the "SUBJECT OFFENSES"), namely:

        a.    All records relating to America Sunshine World Trade Inc.;

        b.    All records related to Cargo Containers with seal numbers: CBHU9033516, TGBU4927389, CAIU4654017, TCNU5576078, and MATU2680094.

        c.    All records related to the shipment of cargo container seals for the following seal numbers: 135841, 1356819, 1356735, 1357647, 1356804, 1201452; MATU25660801, MATU2658383, 1396679, 1396668, 1396644, MATU2759347, MATU2654726, and MATU2666497;

        d.    Any high security bolt seals, including any counterfeit or duplicate high security bolt seals;

        e.    Any counterfeit items or prohibited food items;

        f.    Communications between JI, XU, YU, LI, and FANG related to the shipment of cargo containers;

        g.    Data, records, documents, programs, applications or materials relating to the shipment or smuggling of goods, including ledgers, pay/owe records, distribution or customer

lists, correspondence, receipts, records, rules, regulations, contracts, policies, agreements, and documents noting price, quantities, and/or times goods were bought, sold or otherwise distributed and any materials, documents, or records that are related to the sale, purchase, receipt, or possession of any smuggled goods, including books, receipts, photographs, bills of sale, shipping receipts, identification cards, bank statements, and correspondence discussing, requesting or confirming purchase, sale or shipment;

h.   Tools, paraphernalia, or materials used as a means of packaging, selling, or distributing goods;

i.   Any indicia of occupancy, residency, or ownership of SUBJECT PREMISES 1, 2, or 3 or the SUBJECT VEHICLES, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, photographs, letters, mail, canceled mail envelopes, or clothing;

j.   Items of personal property reflecting names, addresses, telephone numbers, or communications of members or associates involved in the smuggling activities, including personal telephone books, address books, telephone bills, photographs, videotapes, facsimiles, personal notes, cables, telegrams, receipts, and documents and other items;

k.   Any bills and/or subscriber documents related to digital devices;

l.   United States currency, money orders, or similar monetary instruments over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of· deposit, stock certificates, and bonds);

m.   Records, documents, programs, applications, or materials reflecting or relating to payment, receipt, concealment, transfer, or movement of money, including but not limited to bank account records and other financial institution records, wire transfer records, receipts, safe deposit box keys and records, and notes;

n.   Records, communications, information, documents, programs, applications, or materials relating to communications made or records submitted to U.S Customs and Border Protection concerning the importation of merchandise;

o.   Records, communications, information, documents, programs, applications, or materials relating to communications made or records submitted to any/all customs house broker(s);

p.   Records, communications, information, documents, programs, applications, or materials relating to communications made or records submitted to U.S Customs and Border Protection concerning the importation of merchandise;

q.   For all digital devices, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

r.   For all digital devices, records, documents, programs, applications or materials, or evidence of the absence

of same, sufficient to show call log information, including all telephone numbers dialed from any digital devices used to facilitate the SUBJECT OFFENSES and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

s.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email or social media communications or other text or written communications sent to or received from any digital device;

t.   Contents of any calendar or date book, including any calendars or date books stored on any digital devices;

u.   Audio recordings, photographs, video recordings or still captured images on any digital device, phone memory cards, or other storage related to the purchase, sale, transportation, or distribution of controlled substances and listed chemicals or the collection, transfer or laundering of the proceeds of illegal activities;

v.   GPS coordinates and other location information or records identifying travel routes, destinations, origination points, and other locations; and

w.   Any digital device used to facilitate the above listed violations and forensic copies thereof.

2.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

3.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information about Internet Protocol addresses used by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in

digital form on any digital device and any forensic copies
thereof.

5.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

6.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar

facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items

to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

    d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

    g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

    h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Martina Doino, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the Department of Homeland
Security ("DHS") Immigration and Customs Enforcement ("ICE"),
Homeland Security Investigations ("HSI"), and have been so
employed since December 2019.

2.   I attended the HSI Criminal Investigator Training
Program at the Federal Law Enforcement Training Center ("FLETC"),
in Glynco, Georgia.  At FLETC, I received training in conducting
criminal investigations into customs violations such as
narcotics smuggling, interdiction, and distribution of
controlled substances.

3.   I am currently assigned to the Los Angeles Border
Enforcement Security Taskforce ("LA BEST") in Los Angeles,
California, and have been so assigned since August 2021.  LA
BEST is a multiagency task force aimed at identifying,
targeting, and eliminating vulnerabilities to the security of
the United States related to the Los Angeles/Long Beach seaport
complex, as well as the surrounding transportation and maritime
corridors.  My responsibilities include the investigation of
violations of federal criminal laws, including crimes involving
money laundering, narcotics trafficking, smuggling, fraud, and
immigration violations.

4.    Prior to my tenure as a special agent, I was a police officer in Key Biscayne, Florida from February 2015 to May 2019. From July 2018 to May 2019, I was a Task Force Officer ("TFO") on a High Intensity Drug Trafficking Area Task Force, where I participated in investigations into money laundering and drug trafficking crimes in South Florida.  Throughout my law enforcement career, I have participated in numerous criminal investigations involving narcotics importation, exportation or distribution.  Through these investigations, I am familiar with the methods and practices of drug users, drug traffickers, and drug manufacturers.  I have also spoken at length with other HSI SAs and local law enforcement officers regarding methods of drug trafficking.

5.    Through my investigations, my training and experience, and discussions with other law enforcement personnel, I have become familiar with the tactics and methods employed by controlled substance traffickers to smuggle and safeguard controlled substances, distribute controlled substances, and collect and launder the proceeds from the sale of controlled substances.  These methods include, but are not limited to, the use of wireless communications technology, such as cellular telephones and prepaid cellular accounts; counter surveillance; false or fictitious identities; and coded or vague communications in an attempt to avoid detection by law enforcement.

## II.   <u>PURPOSE OF AFFIDAVIT</u>

6.   This affidavit is made in support of applications for search warrants for the following:

a.   6336 Eucalyptus Avenue, Chino, California 91710 (the "**SUBJECT PREMISES 1**"), as described more fully in Attachment A-1;

b.   17895 Lone Ranger Trail, Chino Hills, California 91709 (the "**SUBJECT PREMISES 2**"), as described more fully in Attachment A-2;

c.   7073 Montecito Lane, East Vale, California 92880 (the "**SUBJECT PREMISES 3**"), as described more fully in Attachment A-3;

d.   A 2018 Volvo Truck model VNL bearing California (CA) license plate "YP18603" with vehicle identification number "VIN" 4V4NC9EH6JN890576 registered to America Sunshine World Trade Inc. at **SUBJECT PREMISES 1** (the "**SUBJECT VEHICLE 1**"), as described more fully in Attachment A-4;

e.   A 2019 Volvo Truck bearing California (CA) license plate "YP82479" with VIN 4V4NC9EHXKN219669 registered to America Sunshine World Trade Inc. at **SUBJECT PREMISES 1** (the "**SUBJECT VEHICLE 2**"), as described more fully in Attachment A-5;

f.   A 2019 Volvo Truck bearing California (CA) license plate "YP65715" with VIN 4V4NC9EH3KN899625 registered to America Sunshine World Trade Inc at **SUBJECT PREMISES 1** (the "**SUBJECT VEHICLE 3**"), as described more fully in Attachment A-6; and

g.    A 2019 Volvo Truck bearing California (CA) license plate "XP73298" with VIN 4V4NC9EH5KN899626 registered to America Sunshine World Trade Inc at **SUBJECT PREMISES 1** (the "**SUBJECT VEHICLE 4**"), as described more fully in Attachment A-7;

7.    The requested search warrants seek authorization to seize fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 549 (Removing Goods from Customs Custody); 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 545 (Smuggling Goods into the United States); and 18 U.S.C. § 542 (Entry of Goods by Means of False Statements) (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, and B are incorporated by reference herein.

8.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

III. <u>Background on Cargo Container Shipments at the Port of Los Angeles</u>

9.     United States Customs and Border Protection ("CBP") is responsible for, among other things, the examination of merchandise entering the United States to ensure that it is admissible under and in compliance with United States laws, and the assessment and collection of taxes, fees, and duties on imported merchandise.  In order to properly assess fees, CBP relies on a self-reporting regime in which different custom brokers inform CBP about the contents of the cargo they are trying to import into the United States.

10.     Importers must supply CBP with 10 data elements when bringing goods into the United States which includes: Seller, Buyer, Importer of Record number, Consignee number, Manufacturer/Supplier, Ship To party, Country of Origin, HTSUS number, Container stuffing location, and Consolidator/Stuffer name/address).

11.     CBP has local and national targeting units that targets shipments that may yield prohibited items.

12.     Once cargo has been selected for CBP examination, CBP will examine the contents of the cargo for discrepancies such as verifying whether the manifest is accurate, whether the goods have consistent country of origin markings, whether there are contraband or smuggled goods, as well as inspecting for environmental, and agricultural violations.

13.     Once the shipment has been selected for further inspection, the container is brought to a Centralized

Examination Site CES ("CES") for further inspection.  Containers are supposed to proceed directly to the CES after being selected for inspection.

14.  The Port of Long Beach/Los Angeles handles about 40 percent of secondary inspections for the entire country.  Due to the uniquely high volume at the Port of Long Beach/Los Angeles, the transportation of the containers selected for further inspection is not always controlled by CBP.  In fact, the transportation of some containers selected for inspection is controlled by the broker who filed the entry/importation paperwork.  In Los Angeles, custom brokers are allowed to select their own trucking company to pick up the container and take it to a CES for further inspection.  This type of drayage, which is the process by which a container is unloaded, is called broker controlled drayage.  The broker controlled drayage process is unique to the Los Angeles and Long Beach port.  No other domestic ports have this policy in place.

15.  Once cargo containers are ready for transportation at their place of origin, a high security bolt seal is affixed on the doors of the container, by the carrier, to maintain its integrity and to prevent any unauthorized person from gaining access to the cargo.  The purpose of the high security bolt seal is to ensure that the cargo inside the container is not compromised.  Each high security bolt seal has its own unique identification number that is documented on several import documents.  The high security bolt seal number is assigned by

the vessel carrier that will transport the sea container to its destination.  Below is a picture of a high security bolt seal.



16.   On February 1, 2023, Customs and Border Protection ("CBP") discovered that cargo was missing from a container that had just arrived from China, and that the missing cargo was replaced, or swapped, with cargo that had clearly already entered the United States, some of which had already undergone CBP inspection.

17.   This cargo swap was accomplished by using a fraudulent high security bolt seal that cloned the correctly manifested seal and its unique identification number and gave the appearance that the container had not been opened when it fact its contents had been removed and the fraudulent high security bolt seal installed.

18.   Homeland Security Investigations ("HSI") opened an investigation to determine how the cargo swap occurred, what cargo was removed, and who was involved in orchestrating the breaking of the seal and removal of cargo in customs custody.

19.   Since then, CBP has uncovered 102 more incidents of "cargo swapping."  That is incidents, where cargo containers had their high security bolts cut and the cargo inside removed before being inspected by CBP.

20.   HSI investigators have uncovered the cargo swapping scheme is a direct result of persons illegally exploiting vulnerabilities within the customer broker drayage process at the Port of Long Beach, California.

21.   As described above, CBP allows customs brokers to arrange their own transportation between the port terminals and the centralized examination stations (CES) where CBP conducts inspection on imported goods that have been selected for inspection.

22.   HSI has found some brokers, importers, and logistic companies are not following CBP's explicit instructions to deliver containers directly to the CES locations.

23.   The investigation has uncovered that some containers are diverted during the drayage process to prevent customs inspections and bypass custom fees.

24.   Instead of being brought to the CES, HSI found that some containers are brought to an offsite location, the seal is cut, and the cargo is swapped out for recycled used items.  A clone seal matching the numbers of the original seal is then placed on the container.  The container is ultimately delivered to be inspected by CBP.

25.   HSI has concluded the smuggling scheme undermines the Government's ability to inspect goods coming into the United

States, prevent prohibited items from entering the United States, and impose appropriate custom duty fees.

26.   Although the exact number of swapped cargo incidents are currently unknown, a conservative estimate of losses would be around $50,000 dollars per diverted container in lost custom fees and fines.  Based on the over 100 documented incidents, HSI believes that the scheme has resulted in at least approximately $5,000,000 in lost revenue to the United States.

27.   In March 2024, federal agents were able to determine the cloned seals were being imported via the international mail from China by targets of the investigation.  Agents began an investigation that included intercepting the air parcels, documenting the seal number, and placing CBP holds that would trigger controlled drayage on the impacted shipping containers. This operation led to the identification of more than 40 air parcels containing approximately 88 cloned seals and 79 associated sea containers.

28.   To date HSI has seized more than $50,000,000 worth of prohibited items that would have been diverted and entered the United States without inspection.  The numbers continue to grow every day as more inspections are completed and items are discovered.

## IV. <u>SUMMARY OF PROBABLE CAUSE</u>

29.  On January 25, 2024, CBP officers inspected container number CBHU9033516 (the "3516 Container") which had arrived at the Port of Long Beach, California from China on January 14, 2024.

30.  During the inspection CBP officers found cartons that appeared to have been retaped, which contained metal boxes with hallowed out holes in them.  The presence of these items suggested the cargo had been tampered with prior to the CBP inspection.  Additionally, the shipment was manifested as audio connectors, but no items matched that description within the container.

31.  Federal agents reviewed the records provided by the CES and learned the listed driver for the 3516 Container was Jinning Li.  The listed trucking company was UUL Transportation LLC.

32.  Since that first incident in January of 2024, HSI investigators have associated approximately at least four cargo swapping events to Jinning Li and his company America Sunshine World Trade Inc., registered at **SUBJECT PREMISES 1**.  As described below, these events involved cargo containers with the following numbers: TGBU4927389 (the "7389 Container"), CAIU4654017 (the "4017 Container"), TCNU5576078 (the "6078 Container") and MATU2680094 (the "0094 Container").

33.  A review of records provided to law enforcement by the CES facilities show the **SUBJECT VEHICLES 1, 2, 3,** and **4** (together the "**SUBJECT VEHICLES**") were utilized in approximately

six cargo swapping events and are all registered to America
Sunshine World Trade Inc. at **SUBJECT PREMISES 1**.

34.  As a result of this investigation into cargo swapping,
federal agents began targeting international mail parcels
destined for **SUBJECT PREMISES 2** and **3**.  Between March through
June of 2024, law enforcement was able to identify, and seize,
10 total packages destined for the **SUBJECT PREMISES 2** and **3**.
The inspections of these air parcels led to the discovery of
approximately 21 cloned seals.  The cloned seals corresponded to
20 shipping containers destined for the Port of Long Beach.

35.  The investigation has revealed approximately two air
parcels containing counterfeit cloned seals addressed to "Jimmy
Li or Mr. Shi" at **SUBJECT PREMISES 2**.

36.  Record checks of the California Department of Motor
vehicle system show **SUBJECT PREMISE 2** listed as the address on
Li's California driver license number E2128408.

37.  At least one intercepted air parcel containing cloned
seals listed phone number 620-417-5518 on the shipping label.

38.  Law enforcement record checks revealed Li used the
same phone number on a United States passport application in
2023.

39.  The investigation also revealed eight air parcels
containing cloned seals addressed to "Shan Fang" at **SUBJECT
PREMISE 3**.

40.  Between March through June 2024, federal agents
conducted inspections of the containers identified during the
interception of air parcels destined for **SUBJECT PREMISES 2** and

**3.**   Agents found the containers contained various items that were not manifested correctly including counterfeit shoes, bags, ear buds, prohibited food items, and other illegal freight.

41.   Based on these facts, I believe Li and other unknown co-conspirators participated in cargo swapping events and conspired to divert additional containers by importing cloned seals via the mail.

## V. <u>STATEMENT OF PROBABLE CAUSE</u>

42.   Based on my review of law enforcement reports and court records, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. <u>A cargo swapping event on January 26 involving SUBJECT PREMISE 1 and SUBJECT VEHICLE 1</u>

43.   I know from reviewing law enforcement records, that on January 16, 2024, the 7389 Container arrived at the Port of Long Beach, California aboard the CMA CGM Virginia from Shanghai, China.  On January 9, 2024, CBP placed an examination hold to inspect the contents of that container.

44.   On January 25, 2024, the 7389 Container arrived at the Price CES located in Carson, California at approximately 10:04 p.m.

45.   According to the terminal out gate ticket[1], I know that the 7389 Container was picked up at the Fenix Marine Terminal

---

[1] A terminal out gate ticket is a document provided to truck drivers when exiting a terminal that includes the container number in their possession and time stamps of their departure.

inside the Port of Long Beach on January 24, 2024, at approximately 9:10 p.m.

46.  Based on my review of the in-gate ticket[2] from the Price CES, I know that the container took almost twenty-four hours and fifty-four minutes to reach the Price CES.  The total distance between the Price CES and Long Beach Terminal is approximately 11 miles, with an estimated 25-minute drive time at peak traffic.  The fact that it took the 7389 Container over twenty-four hours to reach the Price CES suggests to me that it was illegally diverted to a third location prior to it being delivered to the Price CES.

47.  I know from reviewing law enforcement reports that on January 26, 2024, CBP inspected the contents of the 7389 Container and found boxes on wood pallets that were plastic wrapped.  The wood pallets had heat treated stamps from the USA, Mexico, France, and Italy.  There were cartons that appeared to have been retaped which contained metal boxes with empty space within them.  The metal boxes were labeled as tool and light fixtures.  Scented dryer sheets were also found inside some of the boxes.

48.  The presence of these items suggested to me that the cargo had been swapped prior to the CBP Inspection.  The shipment was manifested as containing hair curling irons, but no items matching that description were found.  I am also aware of

---

[2] Similar to an out-gate ticket, a terminal ingate ticket is a document provided to truck drivers when entering a terminal that includes the container number in their possession and time stamps of their arrival.

a pattern from past smuggling investigations in which smugglers will utilize dryer sheets to mask the smells of bulk currency, marijuana, or cigarettes in order to avoid detection.

49.   Therefore, based on the presence of this type of cargo and dryer sheets, I came to the conclusion that the original cargo had been swapped and replaced with already inspected cargo.

50.   Based on a review of documents provided by PRICE CES, I know that the trucking company who transported the 7389 Container was UUL Transportation LLC.

51.   The listed driver of the 7389 Container was Chao ZHAO. **SUBJECT VEHICLE 1** was listed as the truck utilized to drop off the 7389 Container at the Price CES Facility.  I know from reviewing California Department of Motor Vehicle records that **SUBJECT VEHICLE 1** is registered to America Sunshine World Trade, Inc. at **SUBJECT PREMISE 1.**

B. **Two cargo swapping events on March 20 and April 15, 2024, involving SUBJECT PREMISE 1 and SUBJECT VEHICLE 2**

52.   I know from reviewing law enforcement records, that on March 4, 2024, the 4017 Container arrived at the Port of Long Beach, California aboard the SM Long Beach from Shanghai, China. Previously on February 21, 2024, CBP placed an examination hold to inspect the contents of that container.

53.   On March 16, 2024, the 4017 Container arrived at the Price CES located in Carson, California at approximately 12:23 a.m.

54.   According to the terminal out gate ticket, I know that the 4017 Container was picked up at the SSA Marine Terminal inside the Port of Long Beach on March 15, 2024, at approximately 11:16 a.m.

55.   Based on my review of the in-gate ticket from the Price CES, I know that the container took almost thirteen hours and seven minutes to reach the Price CES.  The total distance between the Price CES and Long Beach Terminal is approximately 11 miles, with an estimated 25-minute drive time at peak traffic.  The fact that it took the 4017 Container over thirteen hours to reach the Price CES suggests to me that it was illegally diverted to a third location prior to it being delivered to the Price CES.

56.   I know from reviewing law enforcement reports that on March 20, 2024, CBP inspected the contents of the 4017 Container and found packages of universal toolboxes and wall mount cabinets on wood pallets which were plastic wrapped.  The wood pallets had stamps from the USA, Mexico, and France.  Law enforcement also found markings left by CBP from a previous inspection on January 26, 2024.

57.   The presence of these prior CBP markings suggested that the cargo had been swapped prior to the March 20, 2024, CBP Inspection since the container should not have been opened prior, and therefore should not have contained any indicia of past CBP examinations.

58. Based on this evidence, I came to the conclusion that the original cargo had been swapped and replaced with already inspected cargo.

59. Based on a review of documents voluntarily provided by PRICE CES, I know that the trucking company who transported the 4017 Container was America Sunshine World Trade Inc.

60. The listed driver for the 4017 Container was Jingnan Xu using the **SUBJECT VEHICLE 2**. **SUBJECT VEHICLE 2** is registered to America Sunshine World Trade Inc. at **SUBJECT PREMISES 1**.

61. On April 15, 2024, CBP inspected the 5610 Container which arrived from China on April 4, 2024. During the inspection, CBP found markings on the boxes which were from a previous CBP inspection on January 26, 2024. The presence of these markings indicates the cargo had been swapped prior to inspection and the original contents of the container were then diverted.

62. Based on a review of documents voluntarily provided by PRICE CES, I know that the trucking company who transported the 4017 Container was America Sunshine World Trade Inc.

63. The listed driver was Jingnan Xu utilizing **SUBJECT VEHICLE 2**, which is registered to America Sunshine World Trade, Inc. at **SUBJECT PREMISES 1**.

C. <u>**Two cargo swapping events on April 10 and April 18, 2024, involving SUBJECT PREMISE 1 and SUBJECT VEHICLE 3**</u>

64. I know from reviewing law enforcement records, that on March 29, 2024, the 6078 Container arrived at the Port of Long

Beach, California aboard the COSCO France from Nansha, China.
On March 28, 2024, CBP placed an examination hold to inspect the
contents of that container.

65.   On April 9, 2024, the 6078 Container arrived at the
Price CES located in Carson, California at approximately 6:22
p.m.

66.   According to the terminal out gate ticket, I know that
the 6078 Container was picked up at the Long Beach Terminal inside
the Port of Long Beach on April 8, 2024, at approximately 8:46
p.m.

67.   Based on my review of the in-gate ticket from the
Price CES, I know that the container took almost twenty-one
hours and thirty six minutes to reach the Price CES.  The total
distance between the Price CES and Long Beach Terminal is
approximately 11 miles, with an estimated 25-minute drive time
at peak traffic.  The fact that it took the 6078 Container over
twenty hours to reach the Price CES suggests to me that it was
illegally diverted to a third location prior to it being
delivered to the Price CES.

68.   I know from reviewing law enforcement reports that on
April 10, 2024, CBP inspected the contents of the 6078 Container
and found boxes of umbrellas and purple leaf brand aluminum
pergolas.  The boxes appeared dirty and dusty and had delivery
labels with a print date of March 2022.

69. The COSCO[3] seal affixed to the container was scuffed and appeared to have been altered as there were numerous scratches and scuff marks where the seal number was lasered.

70. The presence of these items suggested the cargo had been swapped prior to the CBP Inspection since the items were of little to no value and the boxes were not in optimal condition. The physical state of the seal also suggested to me that it was tampered with.

71. I concluded that the original cargo had been swapped and replaced with already inspected cargo.

72. Based on a review of documents provided by PRICE CES, I know that the trucking company who transported the 6078 Container was America Sunshine World Trade, Inc. The listed driver was Yansheng LI utilizing **SUBJECT VEHICLE 3.**

73. **SUBJECT VEHICLE 3** is registered to America Sunshine World Trade, Inc. at **SUBJECT PREMISES 1.**

74. On April 18, 2024, CBP inspected the 6533 Container which arrived from China on April 10, 2024. During the inspection, CBP found Amazon Basics paper shredders. The boxes were plastic wrapped on wood pallets that had stamps from Mexico, Chile, Peru, and Germany. The Evergreen[4] seal affixed to the container appeared to have had the seal numbered filed down and lasered over.

---

[3] COSCO is an international logistics company that provides seals for cargo containers.
[4] Evergreen is an international logistics company that provides seals for cargo containers.

75.   Based on a review of documents voluntarily provided by FCL CES, I know that the trucking company who transported the 6533 Container was America Sunshine World Trade, Inc.  The listed driver was Jingnan Xu utilizing **SUBJECT VEHICLE 3**, which is registered to America Sunshine World Trade, Inc. at **SUBJECT PREMISES 1**.

### D. Cargo swapping events on May 9, linked to SUBJECT PREMISES 1 and SUBJECT VEHICLE 4

76.   I know from reviewing law enforcement records, that on April 30, 2024, the 0094 Container arrived at the Port of Long Beach, California aboard the MANOA from Shanghai, China. Previously, on April 29, 2024, CBP placed an examination hold to inspect the contents of the 0094 Container.

77.   On May 8, 2024, the 0094 Container arrived at the Price CES located in Carson, California at approximately 6:22 p.m.

78.   According to the terminal out gate ticket, I know that the 0094 Container was picked up at Terminal A inside the Port of Long Beach on May 7, 2024, at approximately 5:42 p.m.

79.   Based on my review of the in-gate ticket from the Price CES, I know that the container took almost sixteen hours and five minutes to reach the Price CES.  The total distance between the Price CES and Terminal A is approximately 11 miles, with an estimated 25-minute drive time at peak traffic.  The fact that it took the 0094 Container over sixteen hours to reach the Price CES suggests to me that it was illegally diverted to a third location prior to it being delivered to the Price CES.

80.   I know from reviewing law enforcement reports that on May 9, 2024, CBP inspected the contents of the 0094 Container and found boxes of Jaki Branded Flower Bouquet building kits, dry wipes, and stretch film, among other miscellaneous items. The cargo was manifested, however, as mobile phone cases.

81.   Based on my training and experience and knowledge of the investigation, as well as the apparently relative low value of the items in light of likely shipping costs, extensive time it took to transport the container to the CES, and inconsistency with the manifest, I believe that the cargo had been swapped prior to the CBP inspection.

82.   Based on a review of documents provided by PRICE CES, I know that the trucking company who transported the 0094 container was America Sunshine World Trade Inc.  The listed driver was Peng YU utilizing **SUBJECT VEHICLE 4**, which is registered to America Sunshine World Trade Inc. at **SUBJECT PREMISES 1**.

### E. Targeting of international mail parcels destined for SUBJECT PREMISE 2 reveals fraudulent cloned seals

83.   On or about March 28, 2024, Task Force Officer Han Yit and I contacted CBP Officers at the UPS Hub in Ontario, California regarding a package that had arrived at the facility from China.

84.   On March 28, 2024, CBP officers conducted a border search of the UPS package at the UPS Hub in Ontario, California after it arrived from China.  Inside the package, law enforcement found eight counterfeit high security bolt seals.

Six of the eight counterfeit high security bolt seals were for MATSON cargo containers with seal numbers 135841, 1356819, 1356735, 1357647, 1356804, and 1201452. The other two high security bolt seals were for COSCO cargo containers with seal numbers SYA2306931 and SYA2108246. MATSON and COSCO are logistic companies that provides worldwide maritime shipping of sea containers among other types of transportation. The package was labeled "Seal Socks Seal Socks."

85. I saw that the listed shipper for the package was Ling Yang, 304 3F Building B Jihe Dianshang, China Mainland.

86. The listed recipient for the package was "Mr. Shi" at **SUBJECT PREMISES 2**.

87. As part of this investigation, the packages were repackaged and released to be delivered to **SUBJECT PREMISES 2**. The packages were then delivered to **SUBJECT PREMISES 2** on April 10, 2024.

88. Based on my knowledge of the investigation, I know that the counterfeit seals inside the air parcel correlated to eight separate sea containers in transit from China. Container numbers MATU25660801 (the "0801 Container") and MATU2658383 (the "8383 Container") were the first to arrive at the Port of Long Beach on March 31, 2024, and April 1, 2024, respectively.

89. On April 9, 2024, Agents inspected the contents of the first container, the 0801 Container, and found it was manifested incorrectly. Inside the container, agents found prohibited items such as counterfeit shoes, bags, synthetic steroids, and rifle iron sights. According to CBP officials,

the total value for the seized items was approximately $16,984,156.

90.   On or about April 23, 2024, CBP officers began the inspection of the 8383 Container, and found it was also manifested incorrectly.  Federal agents found prohibited counterfeit items such as such Apple Air Pods, Chanel handbags, Nike hats, and Ray Bans Sunglasses among other items. The total value for the seized items was approximately $8,071,536.

91.   Based on the existence of the cloned seals and what I learned from prior cargo inspections in this investigation, I believe these containers would have been diverted and a cargo swap would have occurred if law enforcement did not learn about the existence of these containers by intercepting the seals that were destined to arrive at **SUBJECT PREMISE 2.**

92.   On March 21, 2024, I learned that another package was scheduled to be delivered to **SUBJECT PREMISE 2**, which was labeled "Lock Lock."  The listed recipient was "Jimmy LI" with a phone number of 620-417-5518.

93.   I believe "Jimmy Li" is Li based on law enforcement database record checks of the phone number 620-471-5518. Specifically, that phone number was listed on Li's 2023 United States Passport application.

94.   I first learned about this package on March 21, 2024, when it arrived from China at the DHL Cincinnati Hub located in Cincinnati, Ohio.  The package was subsequently released from CBP custody without an inspection and arrived at the DHL

facility in Los Angeles, California to be delivered to **SUBJECT PREMISES 1.**

95.   On March 22, 2024, the package was subsequently seized by HSI.  On April 5, 2024, I obtained a search warrant from the Honorable Magistrate Judge Maria Audero, in case number 2:24-MJ-2020, and searched the contents of the package.

96.   The package contained one cloned MATSON seal with number 1405296.  This seal correlated to a container MATSON 1405296, which had arrived from China on April 9, 2024. The container left the terminal on March 22, 2024, before an inspection could take place.

## F. Targeting of international mail parcels destined for SUBJECT PREMISE 3

97.   On or about May 2, 2024, Task Force Officer Han Yit and I contacted CBP Officers at the Los Angeles International Airport International Bonded Carriers Facility in Los Angeles, California regarding a UPS package that had arrived at the facility from China.

98.   On May 3, 2024, CBP Officers conducted a border search of the UPS package at the Los Angeles International Airport facility.  Inside the package there were three MATSON counterfeit high security bolt seals with seal numbers 1396679, 1396668, and 1396644.  The package was labeled "Door Lock."

99.   I found that the listed shipper for the package was Shanghai Cihui Trading Co LTD, Shanghai, China Mainland.

100. The listed recipient for the package was "Shan Fang" at **SUBJECT PREMISES 3**.  The listed phone number on the shipping label was 626-833-7234.

101. Open-source record checks of the phone number 626-833-7234 came back to UUL Transportation LLC.  I know that in January 2024, Li was identified as the driver for a cargo swapping event where UUL Transportation LLC was listed as the trucking company.

102. I determined that the phone number listed on the UPS package described above is registered to a Jia Zhang, based on the subscriber records described below.

103. I reviewed records obtained from Verizon containing the subscriber data for the phone number listed for the package containing the cloned seals, 626-833-7234.  Based on the information provided by Verizon, the phone number listed for the package was subscribed to by Jia Zhang with a billing address of **SUBJECT PREMISE 3**.

104. The package was repackaged and released to be delivered.  The package was then delivered to **SUBJECT PREMISES 3** on May 4, 2024.

105. The counterfeit seals inside the air parcel corresponded to three separate cargo containers in transit from China with container numbers MATU2759347 (the "9374 Container"), MATU2654726 (the "4726 Container"), and MATU2666497 (the "6497 Container"), which were all slated to arrive at the Port of Long Beach on April 30, 2024.

106.  On or around May 21, 2024, CBP detained and inspected the container the 6497 Container.  During the inspection, CBP found prohibited items such as drug paraphernalia and suspected counterfeit United States quarters.

107.  To date there have been a total of eight international mail shipments containing approximately 11 cloned seals intercepted by HSI that were destined to **SUBJECT PREMISES 3.**

108.  Based on a review of records produced by law enforcement data base checks of "Shan FANG" I learned the following:

    a.  Shan FANG is a Chinese born citizen.  FANG currently has a temporary Visitor Visa B1/B2 which is due to expire on November 16, 2024.

    b.  Fang listed **SUBJECT PREMISES 2** on her United States visa application as her address.

    c.  Zhang is listed as Fang's emergency contact on his travel application.

### VII. TRAINING AND EXPIRIENCE ON SMUGGLING

109.  Based on my training and experience, I am familiar with the methods employed in smuggling operations and the patterns employed by smuggling organizations.  I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their investigations and interviews.  I am knowledgeable in the methods and modes of smuggling operations and the language patterns of these groups. I have become familiar with the methods of operation typically used by smugglers.  Based on my

training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following.

110. Smugglers frequently conduct their illegal activities inside of secure locations, which are private, but to which they have ready access; therefore, I believe that **SUBJECT PREMISES 1, 2**, and **3** are likely to be areas where persons who are engaged in smuggling are located and conduct their operations.

111. Smugglers will frequently keep the smuggled goods supplier and customer records, and other items relating to their smuggling activities at their residences (including garages and outbuildings on their properties), businesses, and other secure areas, such as storage lockers.

112. Smugglers also conceal items related to their crimes in vehicles, including vehicles outside of their residences, or businesses so that they have ready access to them and so that they can hide them from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.

113. Smugglers will often have secret show rooms inside a business or residence to showcase the smuggled goods available, including in locked safes, drawers, and filing cabinets.

114. Smugglers will often receive goods on a regular basis. Such smugglers will thus have an "inventory" that will fluctuate in size depending on the demand for the product.

115. Smugglers often use one or more telephones, pagers, or other digital devices to negotiate times, places, schemes, and

manners for importing, possessing, concealing, manufacturing, and distributing smuggled goods, and for arranging the proceeds from the sale of the smuggled goods.  Additionally, I know that professional smugglers depend upon maintaining both long-distance and local contacts with both suppliers and those down the organizational chain, to the local distributors.

116.  Data contained on digital devices used by smugglers often include, among other things, records of telephone calls, text messages, and e-mail and social media communications between the smugglers and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify stash locations, meeting places, and smuggling routes; and identifying information about the smugglers and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

117.  Individuals involved in smuggling typically pay or receive large sums of money for goods.  Therefore, smugglers typically have significant amounts of cash on hand, as proceeds of sales, to purchase their own supplies, or as profits from their smuggling activities (such as profits from sales or profits from the transportation of smuggled goods).

118.  Smugglers also often maintain in their residences, businesses or vehicles documents relating to their communication devices, in the form of receipts, bills, telephone and address books, and other books and papers which reflect, among other things, the names, addresses, and/or telephone numbers of their

customers, co-conspirators, and associates in the smuggling organization.

119. Individuals involved in smuggling goods can provide goods on credit to trusted distributors in their organization and can obtain smuggled goods from their suppliers on credit. Therefore, I am aware that individuals involved in smuggling goods maintain books, records, customer lists, receipts, notes, ledgers, and other papers relating to the transportation, receipt, ordering, sales, and distribution of goods, proceeds, and equipment, and that such documents may be in code to attempt to thwart law enforcement.

## VIII. TRAINING AND EXPIRIENCE ON DIGITAL DEVICES

120. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

121. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

122. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>CONCLUSION</u>

123. For all the reasons described above there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B, will be found in a search of the SUBJECT PREMISES and SUBJECT VEHICLES, as further described in Attachment A-1, A-2, A-3, A-4, A-5, A-6, and A-7.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 20st day of
June, 2024.


_____
HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE